**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Case No.** |
| **vs.** | **Jury Trial Demanded** |
| **JOHN C. WILSON II and AETHER INNOVATIVE TECHNOLOGY, INC.,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC"), files this

Complaint against Defendants John C. Wilson II ("Wilson") and Aether Innovative Technology,

Inc. ("Aether" and, together, "Defendants"), and alleges as follows:

### SUMMARY

1.      From approximately August 2019 through September 2020, Wilson and Aether, a

Keller, Texas-based technology company, defrauded fifteen investors out of approximately $1.9

million.  To obtain these investor assets, Defendants misrepresented the amount of prior

investments in Aether, the use of investor assets, the deployment of the hardware to be used in

Aether's primary business, and the existence of a significant customer relationship.  Wilson also

misappropriated at least $122,850 for his personal benefit and deceptively attempted to conceal

his fraud from Aether personnel and investors.

2.      In particular, in August 2019, Wilson and Aether raised $1 million from an

investor by selling a convertible note – a debt security that would ultimately allow the investor to

1

obtain shares of Aether's preferred stock – by falsely representing that (i) Aether had secured funding commitments for $28 million from three other investors; (ii) the majority of the investor's assets would be used to purchase equipment that would be deployed in the field immediately; and (iii) a major cell tower company in Aether's industry ("Company A") was Aether's customer.  In reality, none of these funding commitments existed, Aether did not use the funds to purchase equipment that was deployed immediately, and Company A never agreed to become Aether's customer.

3.       Then, from October 2019 to September 2020, Aether and Wilson fraudulently raised approximately $900,000 from fourteen investors, selling them Series A convertible notes ("Series A") – again, a debt security that would ultimately allow the investors to obtain shares of Aether's preferred stock – using offering materials containing materially false and misleading disclosures regarding Aether's existing investors.  Specifically, the Series A offering materials purported to list all the prior Aether investors and the amounts those investors had invested in Aether.  In fact, the first three purported investors listed – with "investments" totaling $770,000 – had not invested any money in Aether at all.

4.       Two of these purported investors had actually invested in a different company Wilson had formed – Aether Network Technology, Inc. ("ANT") – and then abandoned.  The third purported investor (described in the offering materials as having made a $750,000 investment) was Aether's joint venture partner ("JV Partner").  Like the two ANT investors, JV Partner never invested in Aether.

5.       Wilson and Aether later falsely stated in the Series A offering materials that another investor had invested an additional $50,000 in Aether, bringing the total amount of fictional investments to $820,000.  Wilson and Aether continued to overstate the amount received from investors as they provided updated offering materials to future investors.  Thus, by

the time the fourteenth (and final) Series A investor received the offering materials with the list of purported investors and investments, Wilson and Aether overstated the amount invested as $1,715,000 when in fact Aether had received only $895,000 from Series A investors. Accordingly, the offering materials falsely overstated the amount of prior Series A investments from 48% (at the time of the last investment) up to 100% (at the time of the first real investment in October 2019).

6.      Moreover, Wilson and Aether misled the investors by falsely describing, and omitting key facts regarding, how they would use the investor funds they obtained, including by omitting that Wilson would take investor assets for his personal benefit. Wilson misappropriated over $122,850 of the investors assets and used the purloined money to pay for, among other things, a mortgage on his primary residence, a luxury vehicle lease, marina services for his boat, personal utility bills, a gym membership, massages, subscription TV services, and credit card expenses accrued by a family member for groceries and other family expenditures. In addition to taking the money for Wilson, contrary to what Wilson and Aether told investors in the offering materials, they also used Aether investor assets to pay debts owed by ANT (including debts ANT owed to Wilson personally), to pay for industry conferences and consulting fees, and to buy JV Partner's stock.

7.      Wilson engaged in deceptive conduct to prevent Aether personnel and investors from discovering his misappropriation, including on at least one occasion by splitting a wire to divert funds to his personal bank account while making it appear in Aether's records that the entire amount was spent on a legitimate business expense. Wilson also often included false descriptions in bank transfers to disguise that he was taking investor assets for himself.

8.      By engaging in this conduct, Aether and Wilson violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9.      By this Complaint, the SEC seeks permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, and civil penalties against Aether and Wilson, a conduct-based injunction and officer-and-director bar against Wilson, and all other equitable and ancillary relief the Court deems necessary.

## JURISDICTION AND VENUE

10.     The SEC sues under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

11.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].  The investments offered, purchased, and sold as alleged herein were securities as defined under the Securities Act and the Exchange Act.  Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12.     Venue is proper in the Fort Worth Division of the Northern District of Texas pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this district. Defendants offered and sold the securities at issue in this district.  Further, Wilson resides in this district, and Aether's principal place of business is in this district.

## DEFENDANTS

13.     **John C. Wilson II** is, and at all relevant times was, the Chief Executive Officer ("CEO") of Aether Innovative Technology, Inc., and is, and at all relevant times was, the sole

member of its Board of Directors. He resides in, and operated Aether Innovative Technology, Inc. from, Keller, Texas at all relevant times. Before founding Aether, Wilson occupied senior-level positions at two public companies in the information technology and financial services industries.

14.     **Aether Innovative Technology, Inc.** ("Aether") is a Delaware corporation that Wilson caused to be incorporated on July 2, 2019, with its principal place of business in Keller, Texas.

## RELATED ENTITIES

15.     **Aether Network Technology, Inc.** ("ANT") is a Delaware corporation incorporated on February 22, 2019, with its principal place of business in Keller, Texas.

16.     **Clearsite LLC** is a Delaware limited liability company formed on October 9, 2019, with its principal place of business in McLean, Virginia.

## FACTS

**I.     WILSON FOUNDED ANT BUT ABANDONED IT TO FORM AETHER AFTER A FALLING OUT WITH HIS BUSINESS PARTNER**

17.     Wilson co-founded ANT with a business partner in February 2019. ANT's business plan was to collect cellular transmission data, process it, and then sell the processed data to customers, including telecommunications providers, cell tower companies, and first responders, who could use the data to optimize their own operations. ANT and JV Partner intended to form a joint venture, Clearsite LLC, to operate a network of "nodes," which are individual equipment units placed on or near cell towers, and used to collect cellular data. JV Partner was to manufacture and provide the nodes; ANT would coordinate the nodes' installation, operate them, and store the data collected by them; and Clearsite would process and sell the data so collected. Revenue from the data sales would be divided between ANT and JV Partner.

5

18.    ANT received approximately $20,000 from outside investors ("ANT Investor A" and "ANT Investor B"), and Wilson claimed to have used his personal funds to pay some of ANT's business expenses.  As discussed further below, Wilson subsequently used Aether investor assets to reimburse himself for these expenses he incurred on behalf of ANT.

19.    Wilson had a falling out with his ANT business partner in or about July 2019.  He resigned from ANT and formed Aether in July 2019.  Around the same time, JV Partner severed its relationship with ANT and formed a new relationship with Aether.  Aether's business model was identical to ANT's model, described in ¶ 17, above.

## II.    WILSON'S AND AETHER'S MISREPRESENTATIONS AND OMISSIONS TO INVESTOR 1

20.    Around the time that Wilson formed Aether, JV Partner and Aether were in negotiations with Company A to use its infrastructure and services for the first large-scale, real-world test of the nodal network that was central to Aether's business model.  This test was referred to as the "Chicago Deployment" because cellular data was to be collected from cell towers in the Chicago, Illinois area.

21.    Aether required funding for the Chicago Deployment so that it could purchase certain equipment from JV Partner and pay Company A for the services and the lease required to install that equipment on Company A's cell towers.

22.    In August 2019, Wilson contacted a representative of a California-based entity that later became Aether's first investor ("Investor 1") when it paid $1 million to purchase a convertible promissory note issued by Aether.  Wilson, a Texas resident, communicated via email with Investor 1's representative, a California resident.  The representative then forwarded Wilson's emails to Investor 1's principal, who was also a California resident.

23.    On or about August 12, 2019, Wilson, acting on behalf of Aether, sent an email to Investor 1's representative to solicit an investment.  In the email, Wilson wrote:

6

We have closed short term financing commitments from 1 of our 2 Strategic Investors for $3M that is funding next week, 15M from our lead investor the week of the 26th and $10M from the investor who successfully took my COO's previous company public and negotiated the sale to [a large public company].

As you can see below $750K of the $1M from your bridge loan will be used to purchase the servers and radios which we will immediately deploy in Chicago. In addition, we will be acquiring an additional $10M in hardware over the next 30 days from the $28M we have committed to our Series A. Those physical assets would completely de-risk your investment.

a.      Later in this email, Wilson referred to "Our partner & Customer

[Company A]", and in a subsequent passage he wrote:

The initial deployment of CLEARSITE™ in Chicago for [Company A] is going better than planned and the progress has outpaced our Series A Capital Raise. Over the next 45 days we commitments [sic] for 16.5M and another 10M in final diligence but keeping the momentum up requires some Short term Bridge Financing.

To keep up the pace we are on we need some short term bridge money in the next few days so a hard money loan is one of our cleanest options.

b.      Wilson also represented in his email how Aether would use Investor 1's

investment funds, in a section titled "$1M – Short term Use of Funds from your Hard Money

Loan":

High Speed [] Servers - $250K
JV Partner Spectrum Monitoring Equipment - $500K
Working Capital for Chicago Project Team - $150K
Legal Expenses & Closing Costs - $100K

c.      In Wilson's email, the terms "radios" and "Spectrum Monitoring

Equipment" referred to the "nodes" described in ¶ 17, above, which were to be supplied by JV

Partner.

24.     Although Wilson's email referred to a "loan," the investment that Aether and

Investor 1 ultimately agreed to was a security. Aether issued a promissory note to Investor 1 that

could be converted into a Series A convertible note (discussed in greater detail below), which in

turn could be converted into Aether preferred stock.

7

25.     As part of Aether's agreement with Investor 1, Wilson caused Aether to pledge $1 million of Aether-owned equipment – specifically, nodes and servers – as collateral for Investor 1's convertible promissory note.  The pledge was executed simultaneously with the convertible promissory note.

26.     Wilson's representations that other investors had committed funding to Aether were materially false and misleading.  When he sent the August 12, 2019 email, Wilson knew, or was reckless in not knowing, that Aether had not "closed short term financing commitments" from any investor in the amounts or on the timetables specified in his email, and that no investor had committed funds that would permit Aether to "acquir[e] an additional $10M in hardware over the next 30 days."  Nor did the funding Wilson described ever materialize.  As Aether's CEO, Wilson's knowledge, or recklessness, is imputed to Aether.

27.     Wilson's representations that other investors had committed funding to Aether in the amounts and on the timetable specified in his email were material to Investor 1's decision to invest $1 million in Aether.  Wilson's representation falsely communicated that Aether was certain to have sufficient funding to pay the principal and interest due on Investor 1's convertible promissory note by the time its 90-day term expired.  Further, Wilson's representation falsely communicated that Aether was certain to have enough money to buy enough equipment to fully collateralize the note as Wilson had Aether promise.

28.     Wilson's representations that Company A was "Our . . . Customer" and that Clearsite was being deployed in Chicago "for" Company A were also materially false and misleading.  At the time he sent the email, Wilson knew, or was reckless in not knowing, that Company A was not a customer of Clearsite or Aether, and that there was no guarantee that Company A would ever become a customer of Clearsite or Aether.  Indeed, at the time, Clearsite was negotiating to become a customer of Company A, and Company A never became a customer

8

of Clearsite or Aether. As Aether's CEO, Wilson's knowledge, or recklessness, is imputed to Aether.

29.    Wilson's representations that Company A was "Our . . . Customer" and that Clearsite was being deployed in Chicago "for" Company A were also material to Investor 1's decision to invest $1 million in Aether because they falsely communicated that Company A would pay for the data that the Chicago Deployment was to produce, generating revenue that Aether could use to pay the interest and principal that would come due on Investor 1's convertible promissory note.

30.    Wilson's representation that Aether would "immediately deploy in Chicago" the equipment purchased with Investor 1's funds was materially false and misleading. At the time he sent the email, Wilson knew, or was reckless in not knowing, that only planning for the Chicago Deployment had taken place; that Clearsite had not yet executed any agreement with Company A to procure the services and cell tower space necessary to "deploy" the equipment discussed in his email; and that Aether had not obtained the permits necessary to deploy the equipment needed for the Chicago Deployment. As Aether's CEO, Wilson's knowledge, or recklessness, is imputed to Aether.

31.    In fact, Clearsite did not execute any agreement with Company A to obtain the services necessary for the Chicago Deployment until November 5, 2019 (less than two weeks before the term on Investor 1's convertible promissory note was to expire); neither Clearsite nor Aether ever entered into a lease agreement with Company A for cell tower space to install equipment for the Chicago Deployment; and Aether never transported any nodes to the Chicago area, even though these were critical for the Chicago Deployment's implementation.

32.    Wilson's representation that $750,000 of Investor 1's funds would be used to purchase equipment that Aether would "immediately deploy in Chicago" was material to

9

Investor 1's decision to invest because Investor 1 reasonably concluded that Aether would

quickly procure equipment to serve as collateral for the convertible promissory note, which

would be important if Aether failed to pay the interest and principal due on the note on its

maturity date.

33.     But Aether bought only $450,000 worth of nodes from JV Partner, and Aether did

not buy any high-speed servers as specified in Wilson's email.  Thus, Aether bought less than

half the amount of equipment it had pledged to collateralize Investor 1's convertible note.  Even

with this equipment purchase, however, Investor 1's note was ultimately, entirely unsecured.

Aether never took possession of the nodes, and JV Partner had the right to repurchase the nodes

if Aether defaulted on certain agreements.

34.     Wilson and Aether never disclosed to Investor 1 that Aether purchased only

$450,000 of the $750,000 of equipment specified in Wilson's email or that Aether never

purchased the full $1 million in equipment that Aether pledged as collateral to protect Investor

1's convertible promissory note.

35.     On or about August 20, 2019, Investor 1 purchased the convertible promissory

note issued by Aether.  The same day, Investor 1's principal wired $1 million from his brokerage

account in Nebraska into Aether's bank account in Texas.

36.     The convertible promissory note carried a 14% interest rate over a 90-day term.

Investor 1's motive to purchase the convertible note was to make a profit on its investment

derived exclusively from the efforts of Aether and its employees, including Wilson.

37.     The day that Investor 1 signed and returned the convertible promissory note,

Wilson raised the possibility that Investor 1 could convert its note, and later in the same email

chain falsely claimed that Company A was planning to sign a contract expanding its business

with Clearsite.  Investor 1 responded to Wilson that it would decide around the time of the note's

maturity whether to convert, and that Investor 1 might do so if the Series A note's conversion to equity appeared "imminent and favorable" at maturity. Wilson raised the possibility of conversion with Investor 1 multiple times through November 2019.

38.     In an email to Wilson on August 21, 2019, Investor 1's principal referred to the note purchase as "my investment." Wilson's email response also referred to the note purchase as an "investment" and to Investor 1's principal as an "investor."

39.     After purchasing the note, Investor 1 asked Wilson to provide weekly investor updates on Aether's business, and expressed interest in learning about the Chicago Deployment's progress, as well as "any steps towards another valuation and capital raise, etc."

III.    **WILSON AND AETHER SOLD SERIES A NOTES TO AN ADDITIONAL 14 INVESTORS, FALSELY TELLING THESE INVESTORS THAT OTHERS HAD ALREADY INVESTED AT LEAST $770,000 IN THE SERIES A NOTES**

40.     Wilson and Aether offered and sold Series A convertible notes to fourteen other investors ("Investor 2" through "Investor 15") between October 2019 and September 2020, raising approximately $900,000. In connection with purchasing their convertible notes, all but one of these Series A investors transferred funds from their financial accounts outside of Texas into Aether's bank account in Texas.

41.     Each Series A investor considered their purchase of a Series A convertible note to be an investment in Aether. Wilson also periodically provided written and oral "investor updates" to the Series A investors.

42.     Wilson electronically transmitted to Series A investors a copy of Aether's Convertible Promissory Note, a Note Purchase Agreement (or, after July 1, 2020, an Amended and Restated Note Purchase Agreement), and a Term Sheet. He first transmitted these materials to a document services company in California, which then transmitted them to the Series A

investors in various states around the country.  Wilson had ultimate control and authority over the contents of each of these Aether documents.

43.     Each of these documents referred to the person purchasing a Series A convertible note as an "investor."

44.     Included with each Note Purchase Agreement (and Amended and Restated Note Purchase Agreement, as applicable) was an attachment titled "Schedule of Investors."  The Schedule of Investors listed, in chronological order by date of investment, the name of each person and entity that had already purchased Aether's Series A convertible notes, as well as each investor's address, the amount invested, the investment's closing date, and the total amount that had been invested by all Series A investors as of that closing date.  Because the Schedule of Investors was updated for each new Series A investment, each new investor saw the identity and amount invested by each of the earlier investors in the Series A convertible note.

45.     The Schedule of Investors that Wilson and Aether sent to Investors 2 through 15 listed JV Partner, ANT Investor A, and ANT Investor B as the first three investors in Aether's Series A convertible note, and indicated that, together, they had invested $770,000 in Aether. Below is a redacted copy of the first page of the Schedule of Investors that Aether and Wilson provided to Investors 2 through 15:

**EXHIBIT A**
**SCHEDULE OF INVESTORS[1]**

**Initial Closing: July 21, 2019**

| Investor Name and Address | Principal Amount |
|---|---|
| JV Partner Name, Address, and Email Address | $750,000.00 |
| **TOTAL:** | $750,000.00 |

**Second Closing: August 10, 2019**

| Investor Name and Address | Principal Amount |
|---|---|
| ANT Investor A Name, Address, and Email Address | $10,000.00 |
| **TOTAL:** | $760,000.00 |

**Third Closing: October 11, 2019**

| Investor Name and Address | Principal Amount |
|---|---|
| ANT Investor B Name, Address, and Email Address | $10,000.00 |
| **TOTAL:** | $770,000.00 |

---

[1] Company to confirm schedule of closings to date.

46.    The Schedule of Investors was materially false and misleading because JV Partner, ANT Investor A, and ANT Investor B did not invest any money in Aether.

47.    JV Partner did not transfer any cash or other financial assets to Aether at any time before or during Aether's Series A round of financing.  Rather, Wilson caused Aether to issue JV Partner a convertible promissory note in the amount of $750,000 to satisfy a demand for

13

compensation that JV Partner had directed to Aether. JV Partner issued this demand for one of two reasons, neither of which was disclosed to Aether investors. First, Wilson claimed that JV Partner was demanding compensation for the expenses it incurred in its unsuccessful dealings with ANT and Wilson's former business partner when they initially attempted to raise funds for ANT. JV Partner's CEO, however, claimed that the note was issued by Aether as payment for the continued privilege of doing business with JV Partner after JV Partner's board of directors objected to the ongoing business relationship following the bad experience with ANT. It does not matter which story is correct, however, because, either way, Aether did not receive any cash from JV Partner as the Aether investors were led to believe when reviewing the Schedule of Investors.

48.     Similarly, ANT Investor A and ANT Investor B did not transfer any cash or other financial assets to Aether at any time before or during Aether's Series A round of financing. They had originally invested $10,000 each in ANT and would have lost their investments when Wilson abandoned the company to form Aether. Even though ANT and Aether are entirely separate corporations, Wilson sought to avoid ANT Investors A and B losing their investments in ANT by having Aether issue them Series A notes in the amounts they invested in ANT. But, Aether received nothing in return for these liabilities. Aether and Wilson did not disclose the true nature of ANT Investor A's and ANT Investor B's Series A notes to investors before they invested in Aether, and no Series A investor could have understood the true nature of these investments after reviewing the false and misleading Schedule of Investors.

49.     The Schedule of Investors also falsely indicated that Investor 4, who had invested $100,000 on or about November 27, 2019, had invested an additional $50,000 on or about July 30, 2020. Investor 4 did not make this second investment of $50,000.

50.     Thus, by the time the final Series A investor, Investor 15, received the purportedly current version of the Schedule of Investors, Wilson and Aether represented that earlier Series A investors had invested a total of $1,715,000 in Aether. In reality, Aether had received only $895,000 from Series A investors because JV Partner, ANT Investor A, ANT Investor B, and Investor 4 never invested $820,000 as falsely attributed to them in the schedule. Accordingly, Aether and Wilson falsely overstated the amount of prior Series A investments from approximately 48% (at the time of the last Series A investment) up to 100% (at the time of the first real Series A investment in October 2019).

51.     Although Wilson disclosed to Investor 12 before he invested in Aether that JV Partner had not provided $750,000 cash in exchange for its Series A note, Wilson falsely and misleadingly told Investor 12 that JV Partner's "investment" was "in kind." But, even if Wilson's version of events described in ¶ 47, above, is accurate, JV Partner's "in kind" investment would have been in ANT, not Aether.

52.     Wilson's and Aether's misrepresentations that Aether had received between $770,000 and $820,000 in non-existent investments were material to the Series A investors' decisions to invest. According to at least one Series A investor, Investor 4, the Schedule of Investors gave a false and misleading impression of what business operations Aether could afford to undertake.

53.     Wilson knew, or was reckless in not knowing, that the statements regarding the past Series A investors in the Schedule of Investors were materially false and misleading. Wilson was ultimately responsible for all of the statements in Aether's offering materials, including the Schedule of Investors, and was the person who communicated with investors and prospective investors on Aether's behalf, including JV Partner and ANT Investors A and B. Accordingly, Wilson knew, or was reckless in not knowing, that JV partner, ANT Investor A,

15

and ANT Investor B had not invested any cash in Aether as the Schedule of Investors stated. As Aether's CEO, Wilson's knowledge, or recklessness, is imputed to Aether.

**IV.   AETHER AND WILSON REPEATEDLY USED INVESTOR ASSETS IN WAYS THAT WERE NOT DISCLOSED TO INVESTORS AND WILSON MISAPPROPRIATED INVESTOR ASSETS TO BENEFIT HIMSELF AND HIS FAMILY WHILE DECEPTIVELY TRYING TO CONCEAL HIS MISCONDUCT FROM AETHER PERSONNEL AND INVESTORS**

54.     Wilson and Aether repeatedly used investor assets in ways that were not consistent with investor disclosures, including Wilson's misappropriation of investor assets to benefit himself and his family. Wilson also deceptively tried to prevent Aether personnel and investors from discovering his misappropriation.

**a.     Wilson and Aether Misused Investor 1's Funds**

55.     From August 20 to October 28, 2019, the cash in Aether's bank account came exclusively from Investor 1's $1 million investment. As noted, Wilson and Aether represented to Investor 1 that its investment funds would be used for specific purposes, namely:

> High Speed [] Servers - $250K
> JV Partner Spectrum Monitoring Equipment - $500K
> Working Capital for Chicago Project Team - $150K
> Legal Expenses & Closing Costs - $100K

56.     Despite these specific disclosures, on August 21, 2019, Wilson caused Aether to transfer $120,000 in "finder's fees" to two representatives of Investor 1 and $16,022.50 in legal fees to a law firm. Even assuming that this finder's fee was adequately disclosed by Wilson's generic reference to "Legal Expenses & Closing Costs" (Investor 1's principal did not know from reading it that Wilson and Aether agreed to pay his own representatives a 12% finder's fee), these two expenses, combined, exceeded the amount disclosed by over 36%.

57.     In September and October 2019, Wilson and Aether also used Investor 1's assets for other purposes inconsistent with their disclosures, including: (i) to pay $24,000 to a consultant who was helping Aether raise additional investment funds; (ii) to pay $10,000 for

Aether's sponsorship of an industry conference; and (iii) to invest $100,000 purchasing JV Partner's stock. With respect to the JV Partner stock purchase, Wilson deceptively concealed the true use of Investor 1's assets by falsely writing in the bank wire memo "Clearsite Development Costs." Moreover, also in September and October 2019, Wilson caused Aether to transfer a total of $70,000 from Aether's bank account to his personal bank account, as set out in the table in ¶ 61, below.

58.     The statements regarding how Aether and Wilson would use its assets were material to Investor 1. More specifically, it was important to Investor 1 that Aether use its assets to purchase equipment that would both collateralize the investment and allow Aether to begin generating the revenue that Aether would use to pay the principal and interest it owed on the convertible note. Wilson and Aether's misuse of Investor 1's assets described above accomplished neither goal.

### b.     Wilson and Aether Also Misused and Misappropriated the Series A Investors' Assets

59.     Between October 29, 2019 and September 23, 2020, Aether received investments totaling $897,500 from the Series A investors (Investors 2 to 15). Wilson and Aether represented to the Series A investors that their investment funds would be used to "finance [Aether's] operations."

60.     Aether had still not generated any revenue from its business operations during this period. Thus, from October 29, 2019 onwards the cash in Aether's bank account originated almost exclusively from Investor 1's $1 million investment and Investors 2 to 15's $897,500 investments. The only money in Aether's bank account that did not originate from these investments was approximately $223,000 it received from the Small Business Administration's Paycheck Protection Program ("PPP") on May 1, 2020, which Aether used to pay Aether personnel salaries.

17

61.     Wilson caused Aether to transfer over $200,000 of its investors' assets (*i.e.*,
excluding funds Aether obtained from the PPP) from Aether's bank account to Wilson's personal
bank account.  As outlined in the following table, which reflects approximate amounts of
business and personal expenses, Wilson arguably used some of these assets to pay expenses
incurred on behalf of Aether, but misappropriated at least approximately $122,850 to benefit
himself and his family:

| Date of Bank Transfer | Bank Transfer Memo Description | Bank Transfer Amount | Approximate Amount Used for Potential Business Expenses | Approximate Amount Used for Wilson's Personal Expenses |
|---|---|---|---|---|
| 9/3/2019 | Transfer to CHK XXXX3301 | $20,000.00 | | |
| 9/30/2019 | Cash Disb | $20,000.00 | $8,800.00 | $31,000.00 |
| 10/24/2019 | October Corporate Card Expenses | $30,000.00 | $15,700.00 | $14,300.00 |
| 11/22/2019 | Reimbursement to Jw PA For Legal Fees And [document services] | $8,000.00 | | |
| 11/27/2019 | November Corporate Card Expenses | $17,499.69 | $14,100.00 | $11,300.00 |
| 12/9/2019 | December Audit - Accounting Review | $5,000.00 | - | $5,000.00 |
| 1/23/2020 | Corporate Card Payment | $3,000.00 | | |
| 2/13/2020 | January Corporate Expenses | $14,772.85 | | |
| 2/21/2020 | Note Repayment | $30,000.00 | | |
| 2/21/2020 | Amex Corporate Platinum Feb Payment | $16,882.56 | $23,700.00 | $40,900.00 |
| 4/1/2020 | Amex Corporate Platinum Feb Payment | $8,704.19 | $2,400.00 | $6,200.00 |
| 4/23/2020 | Q1 Corporate Expense Reimbursement | $10,000.00 | | |
| 5/8/2020 | Corporate Amex April 2020 Expenses | $5,085.19 | $6,650.00 | $8,400.00 |

| Date of Bank Transfer | Bank Transfer Memo Description | Bank Transfer Amount | Approximate Amount Used for Potential Business Expenses | Approximate Amount Used for Wilson's Personal Expenses |
|---|---|---|---|---|
| 6/12/2020 | June Corporate Platinum Card | $2,347.41 | $1,350.00 | $950.00 |
| 7/24/2020 | Corporate Amex Payment | $4,500.00 | $1,550.00 | $2,950.00 |
| 8/21/2020 | Legal and Amex | $6,902.55 | $6,650.00 | $250.00 |
| 10/2/2020 | Payroll Provider Charges Aug 1-Sep 15 | $1,607.42 | - | $1,600.00 |
| | **Total** | $204,301.86 | $80,900.00 | $122,850.00 |

62.     After Wilson caused Aether to transfer these investor assets to his personal bank account, he used them for a variety of personal expenses, including to pay a mortgage on his personal residence; a lease on a luxury car; slip fees for Wilson's boat at a marina near his home; insurance on personal assets; household groceries and food delivery; personal utilities; a television streaming service subscription; a gym membership; purchases made at various consumer goods and clothing retailers; and a plane ticket for a family member, who was not an Aether employee. Certain of these expenses were incurred to benefit Wilson and his family on a credit card in the name of Wilson's family member, but paid for with Aether investor assets.

63.     Wilson engaged in deceptive conduct in an attempt to conceal his misappropriation from Aether personnel and investors. In particular, on September 30, 2019, Wilson initiated a bank wire of $29,000 from Aether's bank account to an Aether vendor, with the description "Cash Disb," ostensibly to pay an expense owed to that vendor. He subsequently asked Aether's bank to split the wire and transfer $9,000 to the vendor's bank account and $20,000 to his personal bank account, which the bank did. *See* table above at ¶ 61. Thus, Wilson made it appear in Aether's records that the vendor received $29,000, when in reality

Wilson took $20,000 for himself. An Aether employee eventually discovered the split bank wire after contacting the vendor that received part of the wired funds after he grew suspicious of Wilson's use of investor assets.

64.     As shown in the table in ¶ 61, above, Wilson also falsely used the bank transfer memo entries to conceal that he was taking all or a portion of the assets for his personal benefit. For example, Wilson entered memo lines such as "Corporate Card Payment," and "Q1 Corporate Expense Reimbursement," but used only a portion of those assets to pay credit card expenses arguably incurred on behalf of Aether. In at least one instance, Wilson used the bank transfer memo entries when there is no evidence he paid any such expense on behalf of Aether: "December Audit - Accounting Review."

65.     In another instance, the $30,000 transfer on February 21, 2020, as shown in the table, above, at ¶ 61, Wilson omitted significant information from the bank transfer memo entry to make it appear it was a legitimate Aether expense. In particular, Wilson failed to include in the "Note Repayment" memo that these Aether assets were being used to pay a debt purportedly owed to Wilson by ANT, not Aether.

66.     When an Aether employee confronted Wilson about some of the Aether bank transfers to Wilson's personal bank account, Wilson said he was using investor funds to pay for Aether business expenses he had incurred on his personal credit card. When the employee asked to see Wilson's credit card statements to verify the supposed business expenses, Wilson refused. When this employee asked about the February 21, 2020, note repayment described above in ¶ 65 and shown in the table at ¶ 61, Wilson said that this transfer was meant to repay him for personal funds he spent on ANT business expenses, but Wilson admitted that he had created no documentation of the "Note" that was supposedly being repaid. The employee immediately told Wilson that this was not an appropriate use of Aether assets.

67.     The Aether investor assets Wilson transferred to his personal bank account were not salary payments.  First, as discussed, the bank transfer memo entries indicate that the payments were for other purposes.  Second, Aether used a payroll provider to process salaries of Aether personnel.  Finally, and most importantly, Wilson told Aether employees and investors that he was not drawing a salary in exchange for his efforts leading Aether.

68.     Wilson's and Aether's false and misleading disclosures to Investors 1 to 15 concerning Aether's use of their investment funds was material to their decisions to invest in Aether.  These investors expected Wilson and Aether to use their assets to advance Aether's business, as they had been told, with the hope of generating a return on their investment.  They would not have invested in Aether had they known that its CEO was secretly stealing their assets to benefit himself and his family.

69.     Wilson knew, or was reckless in not knowing, that he and Aether misused and misappropriated investor funds as detailed in ¶¶ 54-68, above.  Wilson was ultimately responsible for all of the statements in Aether's offering materials and was the person communicating with investors and prospective investors on Aether's behalf.  Accordingly, Wilson knew, or was reckless in not knowing, what the investors were told regarding how Aether would use their assets.  Moreover, Wilson's permission was required for any bank transfer out of Aether's bank account; he was aware of all transfers of money out of Aether's bank account before each transfer was made; and he personally effected all transfers of money from Aether's bank account to his personal bank account.  Accordingly, Wilson also knew, or was reckless in not knowing, that his misuse and misappropriation of Aether investor assets rendered his and Aether's statements regarding the use of investor assets materially false and misleading.  As Aether's CEO, Wilson's knowledge, or recklessness, is imputed to Aether.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### Against All Defendants

70.     The Commission realleges and incorporates by reference each and every allegation contained in ¶¶ 1-69 as if set forth *verbatim* herein.

71.     By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, in the offer or sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

    a.     knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

    b.     knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.     knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

72.     By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]
### Against All Defendants

73.     The Commission realleges and incorporates by reference each and every allegation contained in ¶¶ 1-69 as if set forth *verbatim* herein.

74.     By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by the use of any means or instrumentality of interstate commerce, or the mails, have:

22

a. employed a device, scheme, or artifice to defraud; and/or

b. made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c. engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

75.   Defendants engaged in the above-referenced conduct knowingly or with severe recklessness.

76.   By engaging in the conduct described above, Defendants have violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

### I.

Finding that Defendants violated the federal securities laws alleged in the Complaint;

### II.

Permanently restraining and enjoining Defendants Wilson and Aether, and all persons in active concert or participation with them, from, directly or indirectly, violating Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)];

## III.

Ordering Defendants Wilson and Aether to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the violations alleged herein, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

## IV.

Ordering Defendants Wilson and Aether to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## V.

Permanently prohibiting Defendant Wilson, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

## VI.

Permanently restraining and enjoining Defendant Wilson from, directly or indirectly, including but not limited to, through any entity owned or controlled by Wilson, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Wilson from purchasing or selling securities for his own accounts;

## VII.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

## VIII.

Granting such other and further relief as the Court may deem just, proper, and equitable.

Dated August 22, 2022                  Respectfully submitted,

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION

Matthew J. Gulde
Illinois Bar No. 6272325
U.S. SECURITIES AND EXCHANGE COMMISSION
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX 76102
Telephone: (817) 978-1410
Facsimile: (817) 978-4927
guldem@sec.gov

Application for Admission *pro hac vice* pending:

Gregory N. Miller
Assistant Chief Litigation Counsel
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-5977
Telephone: (202) 551-4469
millergn@sec.gov

Attorneys for Plaintiff

Of Counsel
George Bagnall
Elizabeth Doisy
Timothy Work
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549