IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, § § § | |
| Plaintiff, § § | |
| v. § | Civil Action No. 4:22-cv-00741-O |
| § | |
| JOHN C. WILSON, II and AETHER INNOVATIVE TECHNOLOGY INC., § § § § | |
| Defendants. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court is the Motion for Final Judgment by Default filed by the United States Securities and Exchange Commission ("SEC") on October 31, 2022. ECF No. 15. Under Federal Rule of Civil Procedure 55(b), the SEC moves this Court for a permanent injunction by default against John C. Wilson, II ("Wilson") and Aether Innovative Technology, Inc. ("Aether") (collectively, "Defendants"). United States District Judge Reed O'Connor referred the Motion and related briefing to the undersigned pursuant to 28 U.S.C. § 636. ECF No. 17. Having considered the Motion and applicable legal authorities, the undersigned **RECOMMENDS** that Judge O'Connor **GRANT** the Motion (ECF No. 15) and **ENTER DEFAULT JUDGMENT** on the SEC's claims against Wilson and Aether.

I.     **BACKGROUND**

According to the SEC's pleadings, Wilson co-founded a company named Aether Network Technology, Inc ("ANT") with a business partner in February 2019. ECF No. 15 at 10. ANT's business plan was to collect cellular transmission data, process it, and then sell the processed data

to customers, including telecommunications providers, cell tower companies, and first responders, who could use the data to optimize their own operations. *Id.* ANT intended to form a joint venture named Clearsite LLC ("Clearsite"), with a joint-venture partner to operate a network of "nodes" (individual equipment units placed on or near cell towers to collect cellular data). *Id.* Revenue from the data sales was to be divided between ANT and the joint-venture partner. *Id.* ANT received approximately $20,000 from outside investors, and Wilson claimed to have used his personal funds to pay some of ANT's expenses. *Id.* Wilson subsequently misappropriated Aether investor assets to reimburse himself for the expenses he incurred on behalf of ANT. *Id.*

Around July 2019, before ANT and the joint-venture partner could form Clearsite, Wilson had a falling out with his ANT business partner, resigned in an attempt to remove his business partner from the business, and formed Aether, a technology company based in Keller, Texas. *Id.* at 11. The joint venture partner severed its relationship with ANT and formed a new relationship with Aether. *Id.* Aether's and ANT's business models were identical. *Id.*

From August 2019 through September 2020, Defendants defrauded fifteen investors out of approximately $1.9 million. *Id.* at 10. To obtain this money, Defendants misrepresented (1) the number of prior and committed investors and their representative financial commitments in Aether, (2) the use of investor assets, (3) the deployment of the hardware to be used in Aether's primary business, and (4) the existence of a significant customer relationship, including with a cell tower company ("Company A"). *Id.* at 10-11. Wilson also misappropriated at least $122,850 for his personal benefit and deceptively attempted to conceal his fraud from Aether personnel and investors. *Id.* at 11. Defendants made these alleged misrepresentations with the scienter required under the Antifraud Provisions of the Securities Act and the Exchange Act, and the

misrepresentations were material to the defrauded investors' decisions to invest in Aether. *Id.* at 10*;* 15 U.S.C. 77q(a)(1)-(3); 17 C.F.R. 240.10b-5.

The SEC filed this lawsuit on August 23, 2022. ECF No. 1. Defendants were properly served on August 25, 2022, and Notice of Service of Process was filed with the Court on September 1, 2022. ECF No. 7. Thereafter the Clerk entered default against Defendants on October 5, 2022. ECF No. 10. A sworn Declaration by Gregory Miller of the SEC proves that Wilson is not an infant, incapacitated person, or in military service. ECF No. 9-1 at 2. In September, Wilson telephoned the SEC office on more than one occasion sharing plans to answer the complaint and to file a request for extension of time with the Court. ECF No. 9-1 at 2-3. The SEC indicated that it would not oppose such a request. ECF Nos. 9 at 2; 9-1 at 2**.**

When neither of the Defendants responded to its complaint and the Court ordered it to file the Motion for Default on or before October 31, 2022, the SEC filed the pending Motion. *Id.* at 3. The Motion includes a Declaration and Amended Declaration proving facts against the Defendants. ECF Nos. 15, 16. To date, neither Wilson nor Aether has filed a response to the Motion.

**II**.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 55 governs the entry of default and default judgment. There are three stages to entry of default judgment. First, a default occurs "when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules." *N.Y. Life Ins. Co.* v. *Brown*, 84 F.3d 137, 141 (5th Cir. 1996); *see also* Fed. R. Civ. P. 55(a) (noting default occurs where the defendant "has failed to plead or otherwise defend" against the complaint). Second, the Clerk may then enter a defendant's default if it is "established by affidavit or otherwise." *Brown*, 84 F.3d at 141 (citing Fed. R. Civ. P. 55(a)). Third, if the Clerk

enters default, the plaintiff must apply for a default judgment from the Court. Fed. R. Civ. P. 55(b)(2). The Court may not enter default judgment against an individual in military service until an attorney is appointed to represent the defendant. 50 U.S.C. § 3931.

However, "[a] party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default." *Lewis* v. *Lynn*, 236 F.3d 766, 767 (5th Cir. 2001). Rather, courts retain ultimate discretion to grant or deny default judgments. *Lindsey* v. *Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). The Fifth Circuit has "adopted a policy in favor of resolving cases on their merits and against the use of default judgments," although this policy is "counterbalanced by considerations of social goals, justice and expediency, a weighing process . . . within the domain of the trial judge's discretion." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 594 (5th Cir. 2014) (quoting *Rogers* v. *Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 936 (5th Cir. 1999)). Default judgment remains "a drastic remedy, not favored by the Federal Rules." *Sun Bank of Ocala* v. *Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989).

Courts use a three-pronged analysis to determine if default judgment is appropriate. *J & J Sports Prods., Inc.* v. *Morelia Mex. Rest., Inc.*, 126 F. Supp. 3d 809, 813 (N.D. Tex. 2015). First, they ask if default judgment is procedurally warranted. *See Lindsey*, 161 F.3d at 893. Second, they analyze the substantive merits of the plaintiff's claims and determine if the pleadings establish a sufficient basis for default judgment. *Nishimatsu Constr. Co.* v. *Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). Third, they determine what form of relief, if any, the plaintiff should receive. *Morelia*, 126 F. Supp. 3d at 814.

4

### III.   ANALYSIS

The Clerk entered Defendants' default (ECF No. 10), and the Court now must determine if default judgment is appropriate. *Lewis*, 236 F.3d at 767. To do so, the undersigned applies the three-pronged inquiry. *See Morelia*, 126 F. Supp. 3d at 813.

#### A.   **Default judgment is procedurally appropriate under *Lindsey*.**

Under *Lindsey*, courts look to six factors to determine whether a default judgment is procedurally warranted. *See Lindsey* 161 F.3d at 893. The Court will consider whether: (1) material issues of fact exist; (2) there has been substantial prejudice; (3) the grounds for default are clearly established; (4) the default was caused by a good faith mistake or excusable neglect; (5) default judgment would be too harsh; and (6) the court would be obliged to set aside the default upon motion from the defendant. *Id*. All six of the *Lindsey* factors support default judgment for the SEC.

No material issues of fact remain concerning Defendants' knowing and material misrepresentations to investors. Defendants have not filed any responsive pleadings, no material facts are in dispute, and the Court may take the SEC's pleadings as true. *See id.*; *Nishimatsu,* 515 F.2d at 1206 (noting that "[t]he defendant, by his default, admits the plaintiff's well-pleaded allegations of fact."). The first *Lindsey* prong favors default judgment.

Similarly, nothing in the record suggests any "substantial prejudice" towards Defendants that would undermine the SEC's entitlement to default judgment. *See Lindsey*, 161 F.3d at 893. Defendants were properly served with the complaint and given ample time and opportunity to respond in this matter. *See* ECF Nos. 5,6. Therefore, *Lindsey's* second prong also favors default judgment.

The grounds for default in this case were clearly established and nothing in this record indicates the default is due to a "good faith mistake or excusable neglect." *See Lindsey*, 161 F.3d

at 893. Process was properly served and executed upon Defendants on August 25, 2022, and Notice of Service of Process was filed with the Court on September 1, 2022. ECF No. 7. The SEC's declaration recounts some communications between the parties, but it has been three months since the referenced telephone and email exchanges. *See* ECF No. 9-1. Despite being afforded multiple opportunities and reasonable time to respond to the SEC's lawsuit, Defendants have failed to respond to the SEC's complaint or file any other pleadings explaining their unresponsiveness. Therefore, the third and fourth *Lindsey* prongs favor default.

Additionally, default judgment against Defendants would not be too harsh a remedy given their failure to respond to the SEC's complaint. *See Lindsey*, 161 F.3d at 893; *see also Joe Hand Promotions, Inc.* v. *Tacos Bar & Grill, LLC*, No. 3:16-cv-01889-M, 2017 F.3d at 893, at *2 (N.D. Tex. Jan. 26, 2017) ("Entering default judgment against [Defendants], who have taken no action to respond to this action, is not "harsh.") (quoting *Lindsey*, 161 F.3d at 893). Default judgment is proportionate to Defendants' conduct. The fifth *Lindsey* prong favors default.

Finally, given the clear satisfaction of the first five factors, nothing indicates that the Court would "be obliged to set aside the default upon motion from the defendant." *See Lindsey*, 161 F.3d at 893; *see also Moreno* v. *LG Elecs.*, 800 F.3d 692, 698 (5th Cir. 2015) (noting district courts are not obliged to set aside a default where "the default was willful, the plaintiff will be prejudiced, or the defendant has no meritorious defense."). Accordingly, the *Lindsey* analysis reflects default judgment is proper here.

### B.  The pleadings establish a sufficient basis for default judgment.

If a default is procedurally warranted under *Lindsey*, courts will next analyze the substantive merits of the plaintiff's claims and ask if the pleadings establish a sufficient basis for default judgment. *Nishimatsu*, 515 F.2d at 1206. Pleadings are sufficient if they meet the

requirements of Federal Rule of Civil Procedure Rule 8. *Wooten* v. *McDonald Transit Assocs.*, *Inc.*, 788 F.3d 490, 498 (5th Cir. 2015); *see* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

The SEC's pleadings establish a sufficient basis to grant a default judgment against Defendants. Wilson's alleged misconduct is imputed to Aether. The Notes in question are "securities" and are subject to the federal securities and exchange acts and suit by the SEC. *SEC v. Constantin,* 939 F. Supp. 2d 288, 304 (S.D.N.Y. 2013). The SEC has alleged numerous violations by Wilson, including violations of 15 U.S.C. 77q(a)(1)-(3) and 17 C.F.R. 240.10b-5. *See* ECF Nos. 1, 15.

### 1.  Defendants' Section 17(a)(1) Violation

Section 17(a) of the Securities Act makes it unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by mail, directly or indirectly

> ( 1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). To prove a violation, the SEC must show that Defendants acted with scienter in employing a device or scheme to defraud in the offer or sale of securities. *Id.*

The SEC alleges, and this Court takes as true, that Defendants engaged in a course of conduct designed to deceive investors by (1) making material misrepresentations, and (2) deceptively attempting to conceal the misappropriation and misuse of investor funds. ECF No. 15 at 25-26. Defendants offered to sell and did sell a Convertible Note to the investors by falsely

7

representing: the amount of prior and committed investments in Aether, the use of investor assets; the deployment of the hardware to be used in Aether's primary business; the existence of a significant customer relationship; and by concealing the misappropriation of investor funds through misrepresentations, omissions, and financial transactions designed to hide their true intent. *Id.*

Wilson acted with scienter because he either knew or was reckless in not knowing that the following representations to the investors' agents were materially false and misleading: (1) other investors had committed funding to Aether; (2) Aether had closed short term financing commitments from investors in the amounts or in the time specified in Wilson's emails; (3) investors had committed funds that permitted Aether to acquire additional hardware over the next thirty days valued at $10 million; (4) Company A was Aether's customer and that Clearsite was being deployed to Chicago; and (5) Aether would immediately deploy in Chicago. *Id.* at 26-27.

Further, Defendants knew or were reckless in not knowing that specific statements regarding other investors' commitments were false and misleading. *Id.* at 27. Finally, Defendants knew or were reckless in not knowing that they were misusing investor funds. *Id.* Wilson caused investor funds to be transferred into his personal bank account. *Id.* He used those funds for a variety of personal expenses, including mortgage payments on his personal residence, a lease on a luxury car, slip fees for his boat, and groceries. *Id.* Therefore, Defendants acted with scienter when conducting business designed to deceive investors.

### 2. Defendants' Section 17(a)(2) Violation

A defendant violates Section 17(a)(2) when it obtains money or property through (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of

securities, (3) by the use of any means or instruments of transportation or communication in interstate commerce or by mail, (4) with negligence. 15 U.S.C. § 77q(a)(2).

The SEC alleges that Wilson had ultimate authority over the content of the written offering materials and other investor communications that contained materially false and misleading statements. ECF No. 15 at 29. Aether also was the "maker of the misstatements" because it was the issuer of the notes. *Id.* The written, misleading, and material statements included false representations to all fifteen investors that Aether had secured $28 million in funding commitments, that the majority of investors' assets would be used to purchase equipment that would be deployed in the field immediately, and that a major cell tower company in the industry was Aether's customer. *Id.* at 30. All of these statements were false. *Id.* Wilson further fraudulently represented that he was certain to have sufficient funding to pay the principal and interest due on the investors' notes by the time their ninety-day terms expired. *Id.* Wilson knew or was reckless in not knowing that based on specific conversations regarding use of investment commitments on certain assets, all of these statements were false and were material to investors' decisions to invest. *Id.* at 32-33. At a minimum, Defendants acted negligently when misleading investors on material facts such as current investment capital and use of assets in violation of Section 17(a)(2).

### 3. Defendants' Section 17(a)(3) Violation

To establish a violation of Section 17(a)(3), the SEC must show that Defendants: (1) engaged in acts, practices, or courses of dealing which operated as a fraud or deceit; (2) in the offer or sale of securities; (3) using interstate commerce or the mail; and (4) negligence. 15 U.S.C. § 77q(a)(3). The same facts alleged in Section 17(a)(1) establishing that Defendants acted with scienter, also establish the lower burden of negligence for Section 17(a)(3) violations. *SEC v. Provident Royalties, LLC.*, No. 3:09-cv-01238-L, 2013 WL 5314354 at *6 (N.D. Tex. Sept. 23,

2013); ECF No. 15 at 34. The facts alleged show that Defendants engaged in a course of conduct that operated as a fraud or deceit on Aether's investors.

### 4. Defendants' Violation of Section 10(b) as Implemented by Rule 10(b)(5)

In addition to violating Section 17 of the Securities Act, Defendants allegedly also violated Section 10(b) of the Exchange Act and Rule 10b-5. Section 10b of the Exchange Act states that "it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mail, or of any facility of any national securities exchange"

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mail, or of any facility of any national securities exchange"

(a) To employ any device, scheme, artifice, to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course or business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240,10b-5. Both Sections require the SEC to prove that Defendants acted with scienter. *SEC v. World Tree Fin., L.L.C.,* 43 F.4th 448, 459- 60 (5th Cir. 2022). The scope is the same. *Id.* To prove a 10b-5 violation, the SEC must show that a defendant (1) committed a deceptive or manipulative act; (2) in furtherance of a scheme to defraud; (3) with scienter. *SEC v. Complete Bus. Sol. Grp.,* 538 F. Supp. 3d 1309, 1339 (S.D. Fla. 2021). To prove a 10b-5 violation for

10

material representation or misleading omission, the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, and (3) made with scienter. *SEC v. Sethi,* 910 F.3d 198, 206 (5th Cir. 2018).

Sections 17(a) and 10(b) and Rule 10b-5 are similar. The only significant difference is that Section 10(b) and Rule 10b-5 apply to acts committed in connection with a purchase or sale of securities while Section 17 applies to acts committed in connection with an offer or sale of securities. Accordingly, "claims arising under the two provisions are often analyzed as one." *SEC v. Farmer,* No. 4:14-cv-2345, 2015 WL 5838897, at *12 (S.D. Tex. Oct 7, 2015). Scienter and materiality are determined under the same standards. *SEC v. Gordon,* No. 3:21-CV-1642-B, 2021 WL 5086556, at *7 (N.D. Tex. Nov. 1, 2021). Finally, the interstate commerce requirement is also essentially identical. *SEC v. Neman,* No. cv 12-03142-BRO, 2016 WL 6661174, at *5 (C.D. Cal. July 15, 2016).

The admitted facts of the complaint establish scheme liability under Section 17(a) and 10b, as implemented by Rules 10b-5. ECF No. 15 at 37. Defendants misappropriated investor funds and deceptively attempted to conceal the misuse of funds from the investors. *Id.* These same materially false misrepresentations and omissions about current number of investors, investment dollars, and use of assets, allow the Court to conclude that Defendants violated Section 17 and 10b. *Id.* The interstate commerce element has been met because Wilson's use of email to investors is considered interstate commerce. *SEC v. Gordon,* 2021 WL 5086556, at *4. Additionally, Wilson as the maker of the documents transmitted these material documents to investors around the country. ECF No. 15 at 38.

    **C.**    **The Court should enter the default judgment in favor of the SEC and grant the requested remedies.**

After concluding that a default judgment is both procedurally valid and substantively well-founded, courts determine what form of relief, if any, the plaintiff should receive. *Morelia*, 126 F. Supp. 3d at 813.

### 1. Permanent Injunction

The SEC requests a permanent injunction against Defendants. ECF Nos. 1, 15. Under Section 20B of the Securities Act and Section 21(d) of the Exchange Act, the Court may impose a permanent injunction if the SEC can make a proper showing that Defendants are engaged or are about to engage in any conduct or practices that violate the Securities Act or the Exchange Act. 15 U.S.C. § 77(t(b); 15 U.S.C. § 78u(d). A permanent injunction is the appropriate remedy to address the Defendants' repeated violations. The Court must consider "the egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of scienter, (4) sincerity of the defendant's recognition of his transgression, and (5) the likelihood of the defendant's job providing opportunities for future violations." *SEC v. Gann,* 565 F.3d 932, 940 (5th Cir. 2009).

The pleadings establish that Defendants' conduct was egregious. They made multiple material misstatements about the amount of prior and committed investors in Aether. ECF No. 15 at 39. They also misrepresented the use of investors' assets, the deployment of hardware to be used in the business, and the existence of significant customer relationships. *Id.* They misappropriated and misused investor funds and never disclosed that those funds were used for Wilson's personal expenses. *Id.* Finally, the investors experienced a near total loss on their investments that they would not have chosen but for these misrepresentations and omissions. *Id.* The incidents of fraud were not isolated in this case. *Id.* The deceitful activity impacted fifteen investors over thirteen months. *Id.* at 40. Defendants have not recognized or acknowledged their wrongdoing, as

evidenced in part, by not participating in this action. *Id.* There is no evidence that Defendants have stopped their violations or that the operation has been terminated. *Id.* Absent permanent injunctive relief, the Court cannot be certain that Defendants will not commit future violations because Wilson's job affords him ample opportunities to do so. *Id.* Because of the repeated violations, the undersigned finds that Defendants engaged in conduct that violated the Securities Act and Exchange Act, and that their actions meet the requirements for injunctive relief to prevent recurrence of such conduct. 15 U.S.C. § 77(t)(b); 15 U.S.C. § 78u(d).

### 2. Disgorgement

The SEC also seeks disgorgement from Wilson in the amount of $122, 850 and $254,000 in disgorgement from Aether. ECF No. 15 at 41. The Court has broad discretion whether to order disgorgement and "to determine the amount of the award." *SEC v. AMX, Int'l, Inc.,* 7 F.3d 71, 73 (5th Cir. 1993)). The Court may order Defendants to pay disgorgement equal to the net profits causally connected to their securities law violations. A "disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims" is permissible equitable relief under Section 21(d)(5) of the Exchange Act. *SEC v. Liu*, 140 S. Ct. 1936, 1939 (2020). Disgorgement also is authorized under amendments to the Exchange Act that Congress enacted after *Liu*. *See* Exchange Act Section 21(d)(7), 15 U.S.C. § 78(u)(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."); Exchange Act Section 21(d)(3)(A)(ii), 15 U.S.C. § 78u(d)(3)(A)(ii) (granting jurisdiction to "require disgorgement . . . of any unjust enrichment by the person who received such unjust enrichment as a result of such violation."). The Fifth Circuit has stated that these new provisions "authorize legal 'disgorgement' apart from the equitable 'disgorgement' permitted by *Liu*." *SEC v. Hallam,* 42 F.4th 316, 341 (5th Cir. 2022). But the court

also stated that the amendments "ratif[y] the pre-*Liu* disgorgement framework used by every circuit court of appeals." *Id.* at 33. However, the distinction is inapplicable to the facts of this case.

Under both grants of authority, "the SEC has the burden reasonably to approximate the defendant's 'unjust enrichment' attributable to the securities violation," which "may not include 'income earned on ill-gotten profits' . . . but it may include interest." *Hallam,* 42 F.4th at 341 (citing *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir. 1978)); ECF No. 15 at 41, 42. Once the SEC establishes a reasonable approximation of a defendant's ill-gotten gains, the burden shifts to the defendant, who "must prove that the requested amount is 'unreasonable.'" *Hallam*, 42 F.4th at 341; ECF No. 15 at 42.

To arrive at the disgorgement amount for Wilson, SEC staff accountant Brian R. Palechek reviewed and analyzed Defendants' bank and credit card records, along with other documents. *See* ECF No. 16 at 2. Mr. Palechek then concluded that Wilson kept at least $122,850 of investor funds, and that he used those funds to pay personal credit card bills, for a slip at a marina, for a luxury car lease, a personal residential mortgage, and other personal items such as television subscriptions, gym and spa membership, and groceries. *Id.* at 3-4.

Mr. Palechek also calculated Aether's ill-gotten gains at $254,000. *Id.* at 4. Based on a review of the transactions in Aether's bank account between August and October 2019, Aether transferred $254,000 from its bank account for expenses that were contrary to the statements Wilson and Aether made to investors' representatives regarding the use of their assets. *Id.* Because Aether's bank account had been funded exclusively by one investor, and the funds Aether transferred out of its bank account were drawn exclusively from that investor's funds, the $254,000 are ill-gotten gains for purposes of calculating Aether's disgorgement amount. *Id.* They also are Aether's ill-gotten and illegitimate business expenses since they were not "marginal costs incurred

in producing the revenues that are subject to disgorgement." *Liu,* 140 S. Ct. at 1950 (citing Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment h, at 216). Rather, the entire $254,000 was the first investor's money that Defendants misused. ECF No. 1 at 55-57.

### 3. Prejudgment Interest

The SEC next seeks $7,457.33 in prejudgment interest from Wilson and $15,418.48 in prejudgment interest from Aether. ECF No. 15 at 43. "[T]he decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion." *SEC v. United Energy Partners,* Inc., No. 3:98-cv-0218-R, 2003 WL 223392, at *1 (N.D. Tex. Jan. 28, 2003) *aff'd,* 88 F. App'x 744 (5th Cir. 2004), *cert. denied*, 542 U.S. 1034 (2004); *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996)). "[W]hether prejudgment interest should be awarded in a Rule 10b–5 action is a question of fairness resting within the district court's sound discretion." *Wolf v. Frank,* 477 F.2d 467, 479 (5th Cir. 1973).

In securities fraud cases such as this one, courts generally calculate prejudgment interest by applying the interest rate used by the Internal Revenue Service ("IRS") for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). *SEC v. Sneed*, No. 3:20-CV-2988-S-BH, 2021 WL 4202171, at *11 (N.D. Tex. Sept. 10, 2021) (citing *First Jersey Sec., Inc.,* 101 F.3d at 1476). The tax underpayment rate represents "what it would have cost to borrow that money from the government" and therefore reasonably approximates the time value of a defendant's ill-gotten gains. *SEC v. Faulkner,* No. 3:16-cv-1735-D, 2021 WL 75551, at *9 (N.D. Tex. Jan. 8, 2021). Prejudgment interest is also consistent with the pre-*Liu* disgorgement framework and was explicitly recognized as appropriate in *Hallam*. *See Hallam* at 341.

Defendants should be ordered to pay prejudgment interest, because they enjoyed the benefit of ill-gotten funds obtained from investors, offending basic principles of justice and equity. Based

15

on an award of $122,850 in disgorgement from Wilson, application of the tax underpayment rate from October 2020 to August 2022, when this action was filed, results in an award against Wilson of $7,457.33 in prejudgment interest. ECF No. 16 at 4. Also, based on an amount of $254,000 in disgorgement from Aether, application of the tax underpayment rate from October 2020 to August 2022, when this action was filed, results in an award of $15,418.48 in prejudgment interest against Aether. *Id.*

### 4. Civil Penalties

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Court to impose third-tier penalties if a defendant's violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1005 (adjusting penalties for inflation). Courts in this district evaluate five factors—the first four of which are the same factors courts review to determine whether to issue an injunction—when determining whether to impose a civil penalty:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Gordon,* 2021 WL 5086556, at *11. As detailed above, Defendants' conduct was egregious; they acted with a high degree of scienter; they directly caused losses to at least fifteen investors of over $1 million; and their conduct was not isolated, as it persisted for thirteen months. ECF No. 15 at 45. Finally, Defendants have neither admitted their wrongdoing nor demonstrated that their financial conditions warrant any reduction in penalties. *Id.* Instead, they have ignored this

proceeding. *Id.* All five factors weigh in favor of the imposition of civil penalties in the amount of $207,183 against Wilson and Aether as requested by the SEC. This is the maximum third-tier civil penalty for an individual at the time the conduct took place. Courts in the Fifth Circuit in similar cases have ordered the same penalty against entity defendants. *See, e.g.*, *SEC v. Moss,* No. 4:20-CV-972-SDJ, 2022 WL 757226 (E.D. Tex. Mar. 11, 2022) (entering default judgment against two entity defendants and ordering each to pay civil penalties of $192,768, then the maximum third-tier penalty for a single violation against an individual).

Accordingly, as requested by the SEC, the undersigned recommends that the Court permanently enjoin Wilson and Aether, and all persons in active concert or participation with them, from, directly or indirectly: (i) violating Sections 17(a)(l), (2) and (3) of the Securities Act of 1933 [15 U.S.C. §§77q(a)(l), (2) and (3)], Section l0(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; (ii) participating in the issuance, purchase, offer, or sale of any security, provided that such injunction shall not prevent Wilson from purchasing or selling securities for his own accounts; and (iii) and, for Defendant Wilson, serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]. Further, the undersigned recommends that the Court grant the SEC's requests for disgorgement, prejudgment interest, and civil penalties as to Wilson and Aether.

## IV. CONCLUSION

Wilson and Aether have engaged in conduct that violates the Securities Act and Exchange Act. The requested remedies are necessary and appropriate to prevent Wilson and Aether from further violations of the securities and exchanges laws. Accordingly, the undersigned

**RECOMMENDS** that Judge O'Connor **GRANT** the SEC's Motion and **ENTER DEFAULT JUDGMENT** in favor of the SEC against Defendants Wilson and Aether as requested by the SEC.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided be law. Any party who objects to any part of these finding, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C § 636(b)(1); Fed R. Civ, 72(b)(2). To be specific, an objection must identify the particular finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglas* v. *United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

**SIGNED** on December 28, 2022.

_____
Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE